RADE KESICH v. OLIVER IRON MINING COMPANY.[1]

February 3, 1933.

No. 29,275.

[1]Reported in 246 N. W. 672.

*Dennis F. Donovan,* for appellant.

*Gannon, Strizich & Kleffman,* for respondent.

HOLT, JUSTICE.

Defendant appeals from the order denying its motion in the alternative for judgment notwithstanding the verdict or a new trial.

Defendant owns and operates an open pit iron mine in North Hibbing known as the Hull Rust mine. It also owns the necessary facilities for mining, viz. the ground for dumping the overburden and waste from the mine, and the right of way upon which are its railroad tracks leading from the mine to the dump. On this right of way are at least four tracks used for carrying material to the dump, bringing the ore out of the mine, and also to the crusher. About one-half of a mile from the pit on the right of way are coal sheds. The main dump now extends about four miles southerly from the pit. At the time here involved the mine was operated in shifts night and day. On the dump two separate crews worked, a crew in charge of the dumping of the cars, and a crew lining up and extending the tracks as needed.

Plaintiff worked in a shift of the latter crew, and at the time in question the work day for him began at seven o'clock in the morning. Near the pit was a so-called location where lived most of defendant's employes, including plaintiff. It was customary for the two crews who worked at the dump to assemble at the coal sheds about 20 minutes before seven o'clock in the morning and ride out in the cab of a locomotive of some train leaving for that place about ten minutes before seven. If no locomotive came up for that destination the men had to walk. The inference from the evidence is that rarely did these men walk the three and one-half miles to the dump. Between the pit and the coal sheds a public road crosses the defendant's right of way and its tracks. The men residing on the

location pass directly to the right of way, others reach it by the public road mentioned and pass southerly along or between the tracks to the coal sheds or the place where they customarily board the engine for their work at the dump.

On the morning of September 27, 1927, at about 6:30 o'clock, plaintiff, walking southerly between the tracks, when within about 400 feet of where he was expecting to board a locomotive, was drenched by discharging steam and water as he passed a standing locomotive headed southerly, the fireman of which at that moment happened to turn the cock on the side of the boiler to draw off part of the water. Plaintiff testified that he asked his foreman for leave to return home and get dry clothes, but was told in effect that his job depended on his going out with the crew that morning. He also testified that the morning was chilly and he had to remain unprotected some 20 minutes before a locomotive came to carry the crews to the dump; that he rode in the open cab of the locomotive with the other men and started working, but took sick and left for home about 11 o'clock and went to bed with a chill.

This testimony cannot be reconciled with the records of defendant, which show that he worked more than his shift on that day. Such records would only corroborate him if the accident happened a week later. However, he worked for two or three days after the date he claims to have been drenched, and then illness set in for many weeks. He now suffers from asthma to such an extent that he is not able to do hard work. Defendant's evidence is that the cock was turned to let out the water and steam before plaintiff reached the locomotive; that he deliberately passed through it; and that thereafter he went home and changed his clothes before going out to the dump. But how plaintiff got wet was a fair question of fact for the jury. Plaintiff admits that there was a watchman's shack near where the accident happened in which there was heat, but he says there were already three or four men in there and no room for more. He did not ask them to permit him to come in nor disclose to them his condition. There is nothing to indicate that had these men been aware of plaintiff's plight they would not have

extended to him the usual kindness and help that the ordinary working man so readily extends to a fellow worker.

The court in general language submitted plaintiff's contributory negligence to the jury but refused to submit the defense of assumption of the risk. As to the risk of being struck with discharging steam and water when passing a locomotive standing on these tracks, we think the trial court's conception of the law to the applicable facts was right. The evidence does not disclose how many locomotives were engaged in the operation of this mine. It does appear that four times every 24 hours the firemen of locomotives drew off, for a minute or two, steam and water from the bottom of the boiler. It seems that the water used forms sediment in the boilers that must be got rid of. To that end some solvent is put in the water; and, at convenient places, when the locomotive is stopped, the fireman proceeds on the running board or rods on the left side of the locomotive and opens this cock of a pipe leading to the bottom of the boiler and draws off a part of the water. After opening the cock he returns to the cab in order to determine from the glass or indicators when enough is drawn off, and then goes back to close or turn off the cock. The inference from the evidence is that it was customary for the fireman to see that no one was in the way of being reached by the water or steam when the cock was turned on; therefore it must be said that the jury had no basis for finding that plaintiff assumed any risk from a wetting when passing a standing locomotive. It may be remarked that there is no suggestion in the proof that the fireman intentionally turned the cock when plaintiff was in danger of being reached.

But we think the learned trial court failed to appreciate that even if no contributory negligence or assumption of risk could be found on this record up to the moment plaintiff was drenched, still such negligence could thereafter occur that there could be no recovery or there could be an assumption by plaintiff of the risk of the consequences of attempting to go to work in wet clothing. The evidence is undisputed that although there was live steam in the boiler, as it and the water reached the air and struck plaintiff, it neither pained nor injured plaintiff's person. No harm was done

except that his clothes got wet. Near by was the watchman's shack with a fire in it. His home was within a ten minutes' walk or a five minutes' run. According to his own testimony, he was then a vigorous and healthy man less than 40 years of age. He had years of experience in mining and operating machinery, and of course was a person of ordinary intelligence. It seems clear that if he chose to stand still exposed to the chill morning air for 20 minutes in his wet clothes, then to proceed in the open cab of a locomotive to his work, and undertook to work in that condition, he assumed the risk that would flow therefrom. Although he did not assume the risk of the drenching, he assumed the risk of the consequences when he deliberately declined to get dry, which he had ample opportunity to do. We think he placed himself within the decision of Jurovich v. Interstate I. Co. 181 Minn. 588, 233 N. W. 465.

We do not overlook plaintiff's testimony, denied by defendant, that he was threatened with discharge if he did not go to work. He refuted this story by the claim that one of the foremen, higher in authority than the one who threatened discharge, was in plaintiff's company when he walked home at 11 o'clock. Nor do we think such threat should be considered of any moment, for plaintiff was not discharged though he left at 11 o'clock. He worked after his illness and was cared for as an employe. There was no medical testimony that if plaintiff had availed himself of the means he admits were at hand, as above stated, to get dry, any injury whatever would have followed. We know from common experience that no ill effect results to a person as healthy and strong as plaintiff professed to be from a drenching if he seasonably sees to it that he is made dry.

We think the same legal conclusion must be reached if we consider plaintiff's conduct on the theory of contributory negligence, and without attempting any fine distinction as in Rase v. M. St. P. & S. S. M. Ry. Co. 107 Minn. 260, 120 N. W. 360, 21 L.R.A.(N.S.) 138. The law is that where another's negligence has caused an injury the injured one is required to use ordinary care not to increase the injury or damage. Here no actual injury to the person

was done. At most his clothes were drenched, and he would have lost a day's wages—mere nominal damages to property. The damages for which the verdict was given were occasioned by plaintiff's contributory negligence in standing around in wet clothing or trying to work in that condition. It fairly may be said that his negligence was the sole cause of his present condition, if we concede that the proof warrants a finding that asthma was traceable to his going to work in wet clothing. We are of the opinion that as a matter of law plaintiff's conduct subsequent to the wrong he suffered at the hands of defendant's servant precludes him from recovering the damages the jury assessed.

In the view we take of the record, there is no occasion to discuss the many propositions presented by the exhaustive briefs. The alleged errors upon rulings have become immaterial. So has the question whether or not plaintiff was under the workmen's compensation act when the accident happened. And also of no importance is the effect of the release received in evidence. In concluding that not the drenching but the conduct of plaintiff after the mishap occurred is the cause of his present disability, it may be noted that the basis of his medical expert's opinion was that the exposure to the chill air in the wet clothing during all the time until he returned to his home a little before noon was unavoidable. The evidence does not sustain the verdict, but entitled defendant to a directed verdict in its favor.

The order is reversed with direction to enter judgment for defendant.

WILSON, Chief Justice (dissenting).

Without considering the question as to whether plaintiff on other grounds is entitled to an affirmance, I do not agree that he was guilty of contributory negligence as a matter of law.

DIBELL, Justice (dissenting).

I agree with the Chief Justice.